**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-1802**

MICHAEL JAFFÉ, Insolvency Administrator,

Plaintiff - Appellant,

v.

SAMSUNG ELECTRONICS COMPANY, LIMITED; INFINEON TECHNOLOGIES
AG; INTERNATIONAL BUSINESS MACHINES CORPORATION; HYNIX
SEMICONDUCTOR, INC.; INTEL CORPORATION; NANYA TECHNOLOGY
CORPORATION; MICRON TECHNOLOGY,

Defendants - Appellees.

------------------------------

UNITED STATES OF AMERICA,

Amicus Curiae,

VERBAND INSOLVENZVERWALTER DEUTSCHLANDS E.V.,

Amicus Supporting Appellant,

THE FEDERATION OF GERMAN INDUSTRIES, a/k/a Bundesverband der
Deutschen Industrie; INTELLECTUAL PROPERTY OWNERS
ASSOCIATION; SEMICONDUCTOR INDUSTRY ASSOCIATION; CHAMBER OF
COMMERCE OF THE UNITED STATES OF AMERICA; NATIONAL
ASSOCIATION OF MANUFACTURERS; BUSINESS SOFTWARE ALLIANCE,

Amici Supporting Appellees.

Appeal from the United States Bankruptcy Court for the Eastern
District of Virginia, at Alexandria.  Stephen S. Mitchell,
Bankruptcy Judge. (09-14766-RGM)

Argued: September 17, 2013          Decided: December 3, 2013

---

Before NIEMEYER, WYNN, and FLOYD, Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Floyd joined. Judge Wynn wrote a separate opinion concurring in Parts I, II, and III and the judgment.

---

**ARGUED:** Jeffrey A. Lamken, MOLOLAMKEN LLP, Washington, D.C., for Appellant. William H. Pratt, KIRKLAND & ELLIS LLP, New York, New York, for Appellees. Mark R. Freeman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae the United States of America. **ON BRIEF:** Robert K. Kry, MOLOLAMKEN LLP, Washington, D.C., for Appellant. Jennifer M. Selendy, John P. Del Monaco, New York, New York, Timothy Muris, Daniel A. Bress, Washington, D.C., William E. Devitt, Dennis J. Abdelnour, KIRKLAND & ELLIS LLP, Chicago, Illinois; Stephen E. Leach, LEACH TRAVELL BRITT, P.C., Tysons Corner, Virginia, for Appellees Infineon Technologies AG, Samsung Electronics Company, Limited, and International Business Machines Corporation. Lawrence A. Katz, LEACH TRAVELL BRITT, P.C., Tysons Corner, Virginia; Theodore G. Brown, III, KILPATRICK TOWNSEND & STOCKTON LLP, Menlo Park, California, for Appellee Hynix Semiconductor, Inc. Joseph E. Mais, Timothy J. Franks, Phoenix, Arizona, John K. Roche, Washington, D.C., Alan D. Smith, PERKINS COIE LLP, Seattle, Washington, for Appellee Intel Corporation. Marc Palay, Geneva, Switzerland, Jonathan Cohn, SIDLEY AUSTIN LLP, Washington, D.C., for Appellee Nanya Technology Corporation. Maurice Horwitz, New York, New York, M. Jarrad Wright, Adam P. Strochak, Washington, D.C., Alfredo R. Perez, Houston, Texas, Jared Bobrow, WEIL, GOTSHAL & MANGES LLP, Redwood Shores, California, for Appellee Micron Technology. Christopher J. Wright, Timothy J. Simeone, WILTSHIRE & GRANNIS, LLP, Washington, D.C., for Amicus Verband Insolvenzverwalter Deutschlands E.V. Neil H. MacBride, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia; Stuart F. Delery, Acting Assistant Attorney General, Robert M. Loeb, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae the United States of America. Richard F. Phillips, Kevin H. Rhodes, INTELLECTUAL PROPERTY OWNERS ASSOCIATION, Washington, D.C.; Jeffrey K. Sherwood, Gary M. Hoffman, Megan S. Woodworth, DICKSTEIN SHAPIRO LLP, Washington, D.C., for Amicus Intellectual Property Owners

Association. Timothy J. Coleman, FRESHFIELDS BRUCKHAUS DERINGER LLP, Washington, D.C., for Amicus Federation of German Industries. David Isaacs, SEMICONDUCTOR INDUSTRY ASSOCIATION, Washington, D.C., for Amicus Semiconductor Industry Association; Paul D. Clement, D. Zachary Hudson, BANCROFT PLLC, Washington, D.C., for Amici Semiconductor Industry Association, Chamber of Commerce of the United States of America, National Association of Manufacturers, and Business Software Alliance; Robin S. Conrad, NATIONAL CHAMBER LITIGATION CENTER, Washington, D.C., for Amicus Chamber of Commerce of the United States of America; Quentin Riegel, NATIONAL ASSOCIATION OF MANUFACTURERS, Washington, D.C., for Amicus National Association of Manufacturers; Timothy A. Molino, BSA/THE SOFTWARE ALLIANCE, Washington, D.C., for Amicus Business Software Alliance.

---

NIEMEYER, Circuit Judge:

This appeal presents the significant question under Chapter 15 of the U.S. Bankruptcy Code of how to mediate between the United States' interests in recognizing and cooperating with a foreign insolvency proceeding and its interests in protecting creditors of the foreign debtor with respect to U.S. assets, as provided in 11 U.S.C. §§ 1521 and 1522.

Qimonda AG, a German corporation that manufactured semiconductor devices and was, for a brief time, one of the world's largest manufacturers of dynamic random access memory ("DRAM"), filed for insolvency in Munich, Germany, in January 2009. The principal assets of Qimonda's estate consisted of some 10,000 patents, about 4,000 of which were U.S. patents. These patents were subject to cross-license agreements with Qimonda's competitors, as was common in the semiconductor industry to avoid infringement risks caused by the "patent thicket" resulting from the overlapping patent rights of some 420,000 patents in the semiconductor industry.

Ancillary to the German insolvency proceeding, Dr. Michael Jaffé, the insolvency administrator appointed by the Munich court, filed an application in the Bankruptcy Court for the Eastern District of Virginia under Chapter 15 of the U.S. Bankruptcy Code, petitioning the U.S. court to recognize the German insolvency proceeding as a "foreign main proceeding" in

4

order to obtain an array of privileges available under Chapter 15. Among other relief, Jaffé specifically requested that the bankruptcy court entrust to him, pursuant to 11 U.S.C. § 1521(a)(5), the administration of all of Qimonda's assets within the territorial jurisdiction of the United States, which largely consisted of the 4,000 U.S. patents.

Contemporaneously with the Chapter 15 proceeding, Jaffé sent letters to licensees of Qimonda's patents under its cross-license agreements, declaring that, under § 103 of the German Insolvency Code, the licenses granted under Qimonda patents "are no longer enforceable," including the licenses under the company's 4,000 U.S. patents. As Jaffé later indicated to the bankruptcy court, he intended to re-license Qimonda's patents for the benefit of Qimonda's creditors, replacing licenses paid for in-kind with cross-licenses with licenses paid for with cash through royalties.

The bankruptcy court entered an order recognizing the German insolvency proceeding as a foreign main proceeding and a separate order granting Jaffé the discretionary relief he requested under § 1521(a)(5). But, following a four-day evidentiary hearing, it conditioned the § 1521 relief with the requirement that Jaffé afford the licensees of Qimonda's U.S. patents the treatment they would have received in the United States under 11 U.S.C. § 365(n), which limits a trustee's

5

ability to reject unilaterally licenses to the debtor's intellectual property by giving licensees the option to retain their rights under the licenses. After balancing the interests of Qimonda's estate with the interests of the licensees of its U.S. patents, the bankruptcy court concluded that the application of § 365(n) was necessary to ensure, as required by § 1522(a), that the licensees were "sufficiently protected," even though it would adversely affect Qimonda's estate. The bankruptcy court also concluded, pursuant to 11 U.S.C. § 1506, that allowing Jaffé to cancel unilaterally Qimonda's licenses of U.S. patents "would be manifestly contrary to the public policy of the United States," recognizing "a fundamental U.S. public policy promoting technological innovation," which would be undermined if it failed to apply § 365(n) to the licenses under Qimonda's U.S. patents.

In this direct appeal from the bankruptcy court, Jaffé challenges both of these conclusions, arguing that the court erred in its construction of Chapter 15 and abused its discretion in applying it.

We conclude that the bankruptcy court properly recognized that Jaffé's request for discretionary relief under § 1521(a) required it to consider "the interests of the creditors and other interested entities, including the debtor" under § 1522(a) and that it properly construed § 1522(a) as requiring the

6

application of a balancing test. Moreover, relying on the particular facts of this case and the extensive record developed during the four-day evidentiary hearing, we also conclude that the bankruptcy court reasonably exercised its discretion in balancing the interests of the licensees against the interests of the debtor and finding that application of § 365(n) was necessary to ensure the licensees under Qimonda's U.S. patents were sufficiently protected. Accordingly, we affirm.

I

The German insolvency proceeding

Qimonda AG filed an application to open a preliminary insolvency proceeding in the Munich Insolvency Court on January 23, 2009, which was converted to a final proceeding on April 1, 2009. Upon converting the proceeding to a final one, the court appointed Dr. Michael Jaffé to serve as the estate's insolvency administrator, a position akin to a bankruptcy trustee under U.S. law. Subsequently, Qimonda ceased all manufacturing operations and began to liquidate its estate. The principal assets of the estate consisted of its approximately 10,000 patents, including about 4,000 U.S. patents. Most of these patents covered products or processes related to DRAM, but some covered other types of semiconductor technology.

7

The "patent thicket" and the practice of cross-licensing

At the time Qimonda opened its insolvency proceeding, its patents were subject to numerous cross-license agreements with other semiconductor manufacturers, including Infineon Technologies AG (from which Qimonda had spun off in 2006), Samsung Electronics Company, International Business Machines Corporation ("IBM"), Intel Corporation, Hynix Semiconductor, Inc., Nanya Technology Corporation, and Micron Technology, Inc. While some of these cross-license agreements were designed to facilitate specific joint ventures, most simply reflected the strategy widely adopted in the semiconductor industry in response to infringement risks arising from the industry's "patent thicket" -- a term used to describe "a dense web of overlapping intellectual property rights." Carl Shapiro, Navigating the Patent Thicket: Cross Licenses, Patent Pools, and Standard Setting, in 1 Innovation Policy and the Economy 119, 120 (Adam B. Jaffe et al. eds., 2001). As the bankruptcy court in this case aptly explained and all parties agreed, there are so many patents implicated by any new semiconductor product that "it would be all but impossible to design around each and every" one. In re Qimonda AG, 462 B.R. 165, 175 (Bankr. E.D. Va. 2011). "Indeed, such is the number of potentially applicable patents that it is not always possible to identify which ones might cover a new product . . . ." Id.

The problem of the patent thicket is exacerbated by the enormous costs incurred to bring a new semiconductor product to market. According to one expert, the price of building a new semiconductor fabrication facility can now exceed $5 billion. These sunk costs could create a classic "holdup" problem if a new product were ultimately found to infringe someone else's patent, with the patent's owner being able to extract a substantially higher royalty after the investment had been made than if a license had been negotiated beforehand. Thus, to avoid this holdup premium and enhance their design freedom, competitors in the semiconductor industry have routinely entered into broad, non-exclusive cross-license agreements with each other, "sometimes with the addition of equalizing payments (either up-front payments or so-called running royalties) to account for differences in the size and breadth of the respective patent portfolios." In re Qimonda AG, 462 B.R. at 175.

Consistent with this industry practice, Qimonda had patent cross-license agreements with nearly every other major semiconductor manufacturer at the time it opened its insolvency proceeding.

9

The Chapter 15 proceeding

Jaffé commenced this Chapter 15 proceeding on June 15, 2009, for recognition of the German insolvency proceeding as a "foreign main proceeding" under 11 U.S.C. § 1517. Jaffé's petition identified Qimonda's known assets in the United States as including its "active patents and patent applications filed with the United States Patent and Trademark Office," and it sought relief designed to "give effect to the German Proceedings in the U.S., protect the U.S. Assets, and to prevent creditors in the U.S. from taking actions that [might] frustrate the German Proceedings." Jaffé also sought an order entrusting to him, under § 1521(a)(5), "[t]he administration or realization of all or part of the assets of [Qimonda] within the territorial jurisdiction of the United States" and further declaring that the "German Proceedings . . . be granted comity and [be] given full force and effect" in the United States.

The bankruptcy court granted the relief Jaffé requested, entering an order granting recognition of the German insolvency proceeding as a "foreign main proceeding" under § 1517. At the same time, it also entered a separate Supplemental Order "grant[ing] further relief under 11 U.S.C. § 1521." The Supplemental Order made Jaffé "the sole and exclusive representative of Qimonda AG in the United States" and, as requested, specifically gave him the power to "administer the

10

assets of Qimonda AG within the territorial jurisdiction of the United States." It authorized Jaffé "to examine witnesses, take evidence, seek production of documents, and deliver information" concerning Qimonda. Finally, it specified that, "in addition to those sections [of the Bankruptcy Code] made applicable pursuant to § 1520," a number of other provisions of the Bankruptcy Code would be "applicable in this proceeding," including 11 U.S.C. § 365. That provision gives a bankruptcy trustee power to assume or reject any of the debtor's executory contracts. But one subsection, § 365(n), limits the trustee's ability to unilaterally reject licenses <u>to the debtor's intellectual property</u>, reserving to the licensees the option to elect to retain their rights under the licenses.

Shortly after the bankruptcy court entered its Supplemental Order, Jaffé began sending letters to companies that had cross-license agreements with Qimonda, invoking § 103 of the German Insolvency Code and declaring that the licenses under Qimonda's patents were "no longer enforceable." Section 103 of the German Insolvency Code, much like § 365 of the U.S. Bankruptcy Code, permits an insolvency administrator to decide whether to continue to perform the debtor's executory contracts. But, unlike § 365, which includes the § 365(n) exception, § 103 does not specifically address intellectual property licenses. In Jaffé's view, however, the licenses under Qimonda's patents fell

11

within the scope of § 103, and it was his duty, as insolvency administrator, not to recognize them since they provided no useful compensation to Qimonda's estate.

After receiving these letters, Samsung and Elpida Memory, Inc., responded with letters, taking the position that 11 U.S.C. § 365(n) protected their licenses under Qimonda's U.S. patents and announcing that they were electing to retain their rights under the licenses.

The letters from Samsung and Elpida prompted Jaffé to move to amend the bankruptcy court's July 22, 2009 Supplemental Order to delete entirely its reference to § 365. Alternatively, Jaffé asked the court to add a proviso to the Supplemental Order specifying that "Section 365(n) applies only if the Foreign Representative rejects an executory contract pursuant to Section 365 (rather than simply exercising the rights granted to the Foreign Representative pursuant to the German Insolvency Code)." Several companies that had licenses under Qimonda's U.S. patents through cross-license agreements -- namely, Infineon, Samsung, Micron, Nanya, IBM, Intel, and Hynix (hereafter, the "Licensees") -- opposed Jaffé's motion to amend the Supplemental Order.[1]

---

[1] Infineon, Samsung, Micron, Nanya, and Elpida originally objected to the motion, while IBM, Intel, and Hynix were later allowed to intervene as objectors. Elpida, which also had

12

By an opinion dated November 19, 2009, the bankruptcy court granted Jaffé's motion, stating that its inclusion of § 365 was "improvident." The court explained that consistent with Chapter 15's goal of "providing a systematic and consistent resolution to cross-border insolvencies," the fate of the patent cross-license agreements should be decided in the German insolvency proceeding by applying German law. The court accordingly amended its Supplemental Order to include the alternative proviso that Jaffé had requested as an amendment.

The appeal to the district court and its remand order

The Licensees appealed the bankruptcy court's amended order to the district court, which thereafter remanded the case back to the bankruptcy court to consider 11 U.S.C. § 1522(a)'s requirement that the bankruptcy court ensure that "the interests of the creditors and other interested entities, including the debtor, [were] sufficiently protected." The district court explained that § 1522(a) required the bankruptcy court "to balance the relief granted to the foreign representative and the interests of those affected by such relief, without unduly favoring one group of creditors over another." In re Qimonda AG

---

elected to enforce its licenses from Qimonda under § 365(n), subsequently reached a settlement with Jaffé and therefore is not an objecting Licensee.

13

Bankr. Litig., 433 B.R. 547, 557 (E.D. Va. 2010) (emphasis omitted) (quoting In re Tri-Cont'l Exch. Ltd., 349 B.R. 627, 637 (Bankr. E.D. Cal. 2006)). The court found it "unclear on [the] somewhat anemic record whether the Bankruptcy Court adequately balanced the parties' interests, as required by § 1522," noting that the bankruptcy court had not adequately explained why the application of § 365(n) would unduly prejudice Jaffé or, conversely, fully considered "whether cancellation of licenses for [Qimonda's U.S. patents] would put at risk [the Licensees'] investments in manufacturing or sales facilities in this country for products covered by the U.S. patents." Id. at 558.

As a separate basis for remand, the district court also found that the bankruptcy court had failed to consider "whether § 365(n) embodies the fundamental public policy of the United States, such that subordinating § 365(n) to German Insolvency Code § 103 is an action 'manifestly contrary to the public policy of the United States,'" under 11 U.S.C. § 1506. 433 B.R. at 565. The district court concluded that there were two primary circumstances in which a bankruptcy court should invoke § 1506: first, when "the foreign proceeding was procedurally unfair;" and second, when "the application of foreign law or the recognition of a foreign main proceeding under Chapter 15 would severely impinge the value and import of a U.S. statutory or constitutional right, such that granting comity would severely

14

hinder United States bankruptcy courts' abilities to carry out . . . the most fundamental policies and purposes of these rights." Id. at 568-69 (internal quotation marks omitted). Finding the application of that standard "unclear on [the] record," the court also directed the bankruptcy court on remand to consider "whether conditioning the applicability of § 365(n) was a prohibited action 'manifestly contrary to the public policy of the United States' under § 1506." Id. at 570-71.

On remand to the bankruptcy court

On remand, Jaffé filed papers in the bankruptcy court in which he committed to re-license Qimonda's patent portfolio to the Licensees at a reasonable and nondiscriminatory ("RAND") royalty. He stated that he was prepared to "enter into good faith negotiations" with the Licensees to set the royalty rates and, if necessary, to submit the rate amounts to arbitration before the World Intellectual Property Organization ("WIPO").[2]

_____

[2] RAND royalties are relatively common in high-tech industries because of the role played by standard-setting organizations, which help ensure the interoperability of products, among other functions. To avoid the holdup problem in this context, standard-setting organizations typically require their members to agree in advance to license any patent identified as necessary to a standard at RAND terms. Both Qimonda and the Licensees belong to such an organization. Nonetheless, the Federal Trade Commission has observed that "there is much debate over whether such RAND . . . commitments can effectively prevent patent owners from imposing excessive royalty obligations on licensees," noting complaints by industry

15

In March 2011, the bankruptcy court held a four-day evidentiary hearing, receiving testimony regarding the likely effects of applying § 365(n) to licenses under Qimonda's U.S. patents.  Jaffé testified at the hearing that a ruling applying § 365(n) would render "the central assets of [Qimonda's] estate, that is [its] U.S. patents . . . largely worthless."  He also said that such a ruling would "violate the principle of equal treatment of creditors under German law" by giving the Licensees preferential treatment over Qimonda's other creditors.

Jaffé also presented the expert testimony of Dr. William Kerr, an economist, who concluded that based on his review of existing licenses and licensing practices in the semiconductor industry, Qimonda's estate would receive approximately $47 million per year if Jaffé were allowed to re-license Qimonda's U.S. patents covering DRAM products at RAND terms.  Observing that $47 million would represent a small fraction of what the Licensees spend on research and development every year, Kerr gave his opinion that "discontinuance of the cross-licenses at issue [and subsequent re-licensing at a RAND rate] would not

---

representatives that the term RAND is "vague and ill-defined -- particularly with regard to what royalty rate is 'reasonable.'" Fed. Trade Comm'n, The Evolving IP Marketplace:  Aligning Patent Notice and Remedies with Competition 192-93 (2011).

unduly impair the function of the semiconductor industry or the [Licensees]."

By contrast, the Licensees' witnesses testified to the harm that would befall the Licensees, as well as the semiconductor industry as a whole, if the reference to § 365(n) were removed from the Supplemental Order. For example, Dr. Jerry Hausman, the Licensees' economist, gave his opinion that "[b]y destabilizing the system of licensing that has enabled the extraordinary success of the semiconductor industry and other industries, failure to apply Section 365(n) would reduce investment, innovation, and competition, which would harm U.S. productivity growth and U.S. consumers as well as worldwide productivity and consumers." Hausman also disputed Kerr's calculation of the likely RAND royalty rates, forecasting significantly higher sums and arguing that the holdup threat could not be eliminated. Moreover, in Hausman's view, Jaffé's offer to re-license the U.S. patents at RAND terms could not "provide adequate protection for the interests of the [Licensees]," in part because of the danger that Jaffé would subsequently sell the patent portfolio to an entity that might itself file for bankruptcy, thus "extinguish[ing] the [Licensees'] licenses once again."

<u>The bankruptcy court's decision on remand</u>

At the conclusion of the hearing, the bankruptcy court issued a memorandum opinion denying Jaffé's motion to amend the Supplemental Order and confirming "that § 365(n) applies with respect to Qimonda's U.S. patents." <u>In re Qimonda AG</u>, 462 B.R. at 185. The court assumed for the purpose of its analysis that Jaffe's interpretation of German law was correct and that § 103 of the German Insolvency Code would authorize him to terminate the Licensees' right to practice Qimonda's patents. With that assumption, the court concluded that "the balancing of debtor and creditor interests required by § 1522(a) . . . weighs in favor of making § 365(n) applicable to Dr. Jaffé's administration of Qimonda's U.S. patents." <u>Id.</u> at 182.

Explaining its balancing analysis, the bankruptcy court recognized that its ruling would "result in less value . . . being realized by the Qimonda estate" but noted that Qimonda's patents would "by no means be rendered worthless." 462 B.R. at 182. On the other hand, the court found that a contrary ruling would create a "very real" "risk to the very substantial investment the [Licensees] . . . [had] collectively made in research and manufacturing facilities in the United States in reliance on the design freedom provided by the cross-license agreements." <u>Id.</u> at 182-83. The court acknowledged that Jaffé's offer to re-license Qimonda's patents on RAND terms

18

would lessen the holdup risk, but observed that, because of the Licensees' "sunk costs, [they would] not have the option of avoiding royalties altogether by designing around the patent." Id. at 181-82.

As an independent ground for its decision, the bankruptcy court also concluded, under 11 U.S.C. § 1506, that "deferring to German law, to the extent it allows cancellation of the U.S. patent licenses, would be manifestly contrary to U.S. public policy." 462 B.R. at 185. Referencing the legislative history of Congress's enactment of the Intellectual Property Licenses in Bankruptcy Act, Pub. L. No. 100-506, 102 Stat. 2538 (1988), the court noted that § 365(n) resulted from Congress's determination "that allowing patent licenses to be terminated in bankruptcy would 'impose[] a burden on American technological development.'" In re Qimonda AG, 462 B.R. at 184 (quoting S. Rep. No. 100-505, at 1 (1988), reprinted in 1988 U.S.C.C.A.N. 3200, 3200). Informed by this congressional policy choice, the court reasoned that "[a]lthough innovation would obviously not come to a grinding halt if licenses to U.S. patents could be cancelled in a foreign insolvency proceeding, the court is persuaded by Professor Hausman's testimony that the resulting uncertainty would nevertheless slow the pace of innovation, to the detriment of the U.S. economy." Id. at 185. On this basis, the court concluded that "failure to apply § 365(n) under the

19

circumstances of this case and this industry would 'severely impinge' an important statutory protection accorded licensees of U.S. patents and thereby undermine a fundamental U.S. public policy promoting technological innovation." Id.

The bankruptcy court thus held that "public policy, as well as the economic harm that would otherwise result to the [L]icensees, require[d] that the protections of § 365(n) apply to Qimonda's U.S. patents." 462 B.R. at 167-68.

The direct appeal to the court of appeals

Jaffé appealed the bankruptcy court's ruling and sought from the district court a certification under 28 U.S.C. § 158(d)(2) for a direct appeal to this court. The district court concluded that the bankruptcy court's order qualified for certification, and, by order dated June 28, 2012, we authorized the direct appeal. See 28 U.S.C. § 158(d)(2).

II

Congress enacted Chapter 15 of the Bankruptcy Code in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23, stating that its purpose was "to incorporate the Model Law on Cross-Border Insolvency," which had been developed in 1997 by the United Nations Commission on International Trade Law ("UNCITRAL"), "so as to provide effective mechanisms for dealing

20

with cases of cross-border insolvency." 11 U.S.C. § 1501(a); see also H.R. Rep. No. 109-31, pt. 1, at 105 (2005), reprinted in 2005 U.S.C.C.A.N. 88, 169. In this respect, Chapter 15 replaced former 11 U.S.C. § 304, which authorized bankruptcy courts to award appropriate relief in a case ancillary to a foreign proceeding but which was largely discretionary. See 11 U.S.C. § 304(c) (2000). Chapter 15 lists five specific objectives: (1) to encourage cooperation with "the courts and other competent authorities of foreign countries involved in cross-border cases;" (2) to increase "legal certainty for trade and investment;" (3) to promote the "fair and efficient administration of cross-border insolvencies" so as to "protect[] the interests of all creditors, and other interested entities, including the debtor;" (4) to protect and maximize "the value of the debtor's assets;" and (5) to facilitate "the rescue of financially troubled businesses." 11 U.S.C. § 1501(a); see also H.R. Rep. No. 109-31, pt. 1, at 105.

To further these stated objectives, Chapter 15 authorizes the representative of a foreign insolvency proceeding to commence a case in a U.S. bankruptcy court by filing a petition for recognition of the foreign proceeding. 11 U.S.C. §§ 1504, 1509(a), 1515. If the petition meets the requirements listed in § 1517, the court must enter an order granting recognition of the foreign proceeding. And if that foreign proceeding "is

pending in the country where the debtor has the center of its main interests," it is recognized as a "foreign main proceeding." 11 U.S.C. § 1517(b)(1); see also id. § 1502(4). With the entry of an order recognizing a foreign main proceeding, the foreign representative of the proceeding automatically receives relief as stated in § 1520, including the automatic stay created by § 362 with respect to the debtor and its property within the United States and the ability to operate the debtor's business within the United States under § 363, as well as the right to sue and be sued and the right to "intervene in any proceedings in a State or Federal court in the United States in which the debtor is a party." Id. §§ 1520(a), 1509(b)(1), 1524. Moreover, the statute provides that following entry of a recognition order, "a court in the United States shall grant comity or cooperation to the foreign representative," thereby implementing a principal purpose of Chapter 15. Id. § 1509(b)(3).

Even before entry of the order granting recognition, § 1519 authorizes the bankruptcy court, on the foreign representative's request, to grant preliminary relief when "urgently needed to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1519.

In addition to the automatic relief that comes with the entry of an order granting recognition of a foreign main

22

proceeding, § 1521 authorizes the bankruptcy court to grant discretionary relief. Specifically, § 1521 provides that "where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief." 11 U.S.C. § 1521(a). This discretionary relief may include "entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative," id. § 1521(a)(5), as well as "entrust[ing] the distribution of all or part of the debtor's assets located in the United States to the foreign representative," id. § 1521(b). The bankruptcy court, however, may only grant discretionary relief under § 1521 if it determines that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." Id. § 1522(a). It may also subject the discretionary relief it grants under § 1521 "to conditions it considers appropriate, including the giving of security or the filing of a bond." Id. § 1522(b).

Finally, all of the actions authorized in Chapter 15 are subject to § 1506, which provides that "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly

23

contrary to the public policy of the United States." 11 U.S.C. § 1506.

Chapter 15 thus authorizes an "ancillary" proceeding in a United States bankruptcy court that is largely designed to complement and assist a foreign insolvency proceeding by, among other things, "bring[ing] people and property beyond the foreign main proceeding's jurisdiction into the foreign main proceeding through the exercise of the United States' jurisdiction." In re ABC Learning Centres Ltd., 728 F.3d 301, 307 (3d Cir. 2013); see also H.R. Rep. No. 109-31, pt. 1, at 106 ("Cases brought under chapter 15 are intended to be ancillary to cases brought in a debtor's home country . . ."). This structure reflects "the United States policy in favor of a general rule that countries other than the home country of the debtor, where a main proceeding would be brought, should usually act through ancillary proceedings in aid of the main proceedings, in preference to a system of full bankruptcies (often called 'secondary' proceedings) in each state where assets are found." H.R. Rep. No. 109-31, pt. 1, at 108. Notwithstanding this general policy, Chapter 15 also expressly contemplates that "[a]fter recognition of a foreign main proceeding, a case under another chapter of [the Bankruptcy Code] may be commenced . . . if the debtor has assets in the United States." 11 U.S.C. § 1528.

Thus, taken as a whole, Chapter 15 -- like the Model Law on which it was based -- takes "several modest but significant" steps toward implementing "a modern, harmonized and fair framework to address more effectively instances of cross-border insolvency."  UNCITRAL, Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency, in Legislative Guide on Insolvency Law 307, 307 (2005) (hereinafter, "Guide to Enactment").

III

Jaffé contends that the bankruptcy court erred by employing § 1522(a)'s sufficient protection requirement to subject his "right to administer [Qimonda's] U.S. patents . . . to the constraints imposed by § 365(n)," thus allowing the Licensees to elect to retain their license rights under Qimonda's U.S. patents, contrary to German law as he understands it.  In re Qimonda AG, 462 B.R. at 183.  The bankruptcy court limited the authority it conferred on Jaffé under § 1521(a)(5) by balancing the interests of the Licensees with the interests of Qimonda's estate under § 1522(a) and concluding that the Licensees should receive the protection of § 365(n).  Id. at 180-83.  In support of his challenge, Jaffé makes essentially three arguments:  (1) that the district court and the bankruptcy court erred in even considering § 1522(a), because that section applies only to

25

relief granted under § 1521, that the relief granted under § 1521 may be requested only by the foreign representative, and that he, as the foreign representative, never requested the inclusion of § 365(n) as part of the § 1521 relief; (2) that the bankruptcy court misunderstood the type of protection afforded by § 1522(a) by applying a test that balanced the debtor's interests and the creditors' interests instead of a test that placed all creditors on an equal footing; and (3) that in balancing the competing interests, the bankruptcy court overstated the risks to the Licensees, especially in view of Jaffé's offer to re-license Qimonda's patents to them, and failed to treat all creditors' interests equally. We address these points in order.[3]

---

[3] We note as well that the United States has appeared as _amicus curiae_ to express its concern that the bankruptcy court overstepped its authority below. Specifically, it criticizes the bankruptcy court as "approach[ing] this case as though it were empowered to decide whether the Foreign Administrator should be permitted to reject appellees' license agreements" based on an erroneous assumption that it could "superimpose Section 365(n) on the operation of German insolvency law in a German proceeding." The United States therefore urges us to "reverse[] on the threshold ground that Section 365(n) cannot constrain the operation of German insolvency law in Germany."

As already made clear, however, we take a different view of the scope of the bankruptcy court's holding. Rather than purporting to "constrain the operation of German insolvency law in Germany," the bankruptcy court conditioned its grant of power to Jaffé to "administer the assets of Qimonda AG within the territorial jurisdiction of the United States" with the limitation that he was taking the company's U.S. patents subject

First, Jaffé argues that both the bankruptcy court and the district court erred in even considering § 1522's sufficient protection requirement because § 1522(a) applies to relief that may be granted under § 1521, and § 1521(a), in turn, provides that "the court may, <u>at the request of the foreign representative</u>, grant any appropriate relief." (Emphasis added). He asserts that he "never asked the bankruptcy court to include § 365 in its Supplemental Order or sought other relief relating to § 365(n)" such that the Licensees would have the option to retain their licenses under Qimonda's U.S. patents. Thus, according to Jaffé, because application of § 365 was not specifically requested by him, the bankruptcy court's <u>sua</u> <u>sponte</u> inclusion of § 365 was legal error, the correction of which must precede any consideration of § 1522(a)'s sufficient protection requirement.

We believe that Jaffé's view of the relationship between § 1521(a) and § 1522(a) is too myopic. While it is true that

---

to the preexisting licenses, which he was obliged to treat in a manner consistent with § 365(n). As a result, Jaffé is precluded from rejecting the U.S. patent licenses <u>as a matter of U.S. law</u>. Although this limitation may have indirect effects in the German proceeding, it does not represent an impermissible application of U.S. law extraterritorially, which we understand to be the main concern animating the United States' position in this case.

Jaffé "never affirmatively requested rejection authority under § 365," he did request several forms of discretionary relief under § 1521, among which was the privilege, pursuant to § 1521(a)(5), to have the bankruptcy court entrust him with "[t]he administration or realization of all or part of the assets of [Qimonda] within the territorial jurisdiction of the United States," specifically identifying the company's U.S. patents as among the U.S. assets he sought to control. And, as a prerequisite to awarding any § 1521 relief, the court was required to ensure sufficient protection of the creditors and the debtor. Section 1522(a) states this explicitly, providing in relevant part, "The court may grant relief under section . . . 1521 . . . only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a) (emphasis added). Additionally, the court was authorized to "subject" any § 1521 relief "to conditions it considers appropriate." Id. § 1522(b); see also H.R. Rep. No. 109-31, pt. 1, at 116 (describing § 1522 as "giv[ing] the bankruptcy court broad latitude to mold relief to meet specific circumstances, including appropriate responses if it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors").

This is precisely what the bankruptcy court did here. It granted discretionary relief under § 1521 and, as mandated,

considered the question of sufficient protection under § 1522(a). Upon such consideration, it conditioned its § 1521 relief on application of § 365(n), finding that such protection was appropriate in the circumstances presented.

To be sure, the bankruptcy court did not frame its <u>initial</u> inclusion of § 365 in the Supplemental Order as a condition on the authority it was granting Jaffé under § 1521. Indeed, when initially faced with Jaffé's motion to amend, the court described the inclusion of § 365 as "improvident." But on the Licensees' appeal, the district court correctly recognized that it was incumbent on the bankruptcy court, on remand, to consider whether "the interests of the creditors and other interested entities, including the debtor, [would be] sufficiently protected" under § 1522(a) were the court to modify its earlier order so as to grant Jaffé control over the administration of Qimonda's U.S. patents without providing for the application of § 365(n) to the licenses on those patents. See <u>In re Qimonda AG Bankr. Litig.</u>, 433 B.R. at 557-58.

The bankruptcy court's consideration of § 1522(a) was thus undoubtedly appropriate when authorizing relief under § 1521.

B

Jaffé next contends that even if the bankruptcy court was correct to consider § 1522's sufficient protection requirement

29

in granting § 1521 relief, the court nonetheless employed the wrong test in applying § 1522(a). He maintains that the bankruptcy court's "ruling fundamentally misunderst[ood] the 'interests' § 1522(a) protects" by failing to recognize that § 1522(a) is merely a procedural protection "designed to ensure that all creditors [could] participate in the bankruptcy distribution on an equal footing" and thus should not be used to protect parties from the substantive bankruptcy law that would otherwise apply in the foreign main proceeding. (Emphasis added). He asserts that "[d]isregarding foreign law based on an open-ended balancing test under § 1522(a) is contrary to Chapter 15's basic design," which, according to Jaffé, requires U.S. courts to defer to foreign substantive law except only as allowed under § 1506, which provides a narrow exception when the court's action would otherwise violate "the most fundamental policies of the United States." H.R. Rep. No. 109-31, pt. 1, at 109. In sum, he argues (1) that the bankruptcy court erred by interpreting § 1522's sufficient protection requirement as incorporating a balancing test that could achieve a result that treated creditors differently and that would therefore be in tension with German law, and (2) that, to the extent § 1522(a) was implicated at all, the bankruptcy court should have limited its analysis to ensuring that the doors of the German insolvency

30

proceeding would be open to the Licensees on <u>equal</u> footing with Qimonda's other creditors.

Jaffé's theory of how the sufficient protection requirement of § 1522(a) operates is not illogical. The text of the statute is broad and somewhat ambiguous regarding the test that courts should employ to determine "if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a). But we are not convinced that Jaffé's theory can fully be squared with the text or with Congress's intent in enacting the text.

Section 1522(a) requires the bankruptcy court to ensure the protection of <u>both</u> the creditors and the debtor. 11 U.S.C. § 1522(a). The provision thus requires the court to ensure that the relief a foreign representative requests under § 1521 does not impinge excessively on any one entity's interests, implying that each entity must receive at least some protection. And because the interests of the creditors and the interests of the debtor are often antagonistic, as they are here, providing protection to one side might well come at some expense to the other. The analysis required by § 1522(a) is therefore logically best done by balancing the respective interests based on the relative harms and benefits in light of the circumstances presented, thus inherently calling for application of a balancing test.

31

We also find support for this interpretation in the Model Law on Cross-Border Insolvency, on which Chapter 15 was based. In enacting Chapter 15, Congress stated that it intended to codify the Model Law. See 11 U.S.C. § 1501(a). And, in doing so, it also indicated strongly that the Model Law, and the accompanying Guide to Enactment issued by UNCITRAL in conjunction with its adoption of the Model Law, should inform our interpretation of Chapter 15's provisions. Indeed, Chapter 15 provides that "[i]n interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." Id. § 1508; see also H.R. Rep. No. 109-31, pt. 1, at 109-10 ("Interpretation of this chapter on a uniform basis will be aided by reference to the Guide and the Reports cited therein, which explain the reasons for the terms used and often cite their origins as well. . . . To the extent that the United States courts rely on these sources, their decisions will more likely be regarded as persuasive elsewhere" (emphasis added)). Thus, the Model Law and its Guide to Enactment also provide relevant guidance in determining the appropriate meaning of Chapter 15's provisions.

The Guide to Enactment contains a number of paragraphs that bear directly on the question of how a court should assess the

32

interests of others and protect them prior to granting the discretionary relief sought by a foreign representative. For example, the Guide acknowledges that the representative of a foreign main proceeding will "normally seek[] to gain control over all assets of the insolvent debtor." Guide to Enactment ¶ 158, at 347. But it stresses that the Model Law makes "[t]he 'turnover' of assets to the foreign representative . . . discretionary," adding that "the Model Law contains several safeguards designed to ensure the protection of local interests before assets are turned over to the foreign representative." Id. ¶ 157, at 347 (emphasis added). Chief among those "safeguards" is Article 22 of the Model Law, which is largely codified as § 1522.[4] According to the Guide, "The idea

---

[4] Article 22 of the Model Law provides in full:

1. In granting or denying relief under article 19 or 21, or in modifying or terminating relief under paragraph 3 of this article, the court must be satisfied that the interests of the creditors and other interested persons, including the debtor, are adequately protected.

2. The court may subject relief granted under article 19 or 21 to conditions it considers appropriate.

3. The court may, at the request of the foreign representative or a person affected by relief granted under article 19 or 21, or at its own motion, modify or terminate such relief.

Comparing Article 22 and § 1522 reveals that Congress relied heavily on the language of the Model Law. One of the few

underlying [A]rticle 22 is that there should be a <u>balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief</u>. This balance is essential to achieve the objectives of cross-border insolvency legislation." <u>Id.</u> ¶ 161, at 348 (emphasis added). The Guide to Enactment separately indicates that Article 22 is designed to "protect the interests of the creditors (in particular local creditors), the debtor and other affected persons." <u>Id.</u> ¶ 35, at 314. Finally, the Guide states, "[i]n addition to [Article 22's] specific provisions," Article 6 of the Model Law "<u>in a general way</u> provides that the court may refuse to take an action governed by the Model Law if the action would be manifestly contrary to the public policy of the enacting State." <u>Id.</u> ¶ 36, at 314 (emphasis added).

Informed by the Guide to Enactment's description of the relationship between Articles 22 and 6 of the Model Law (§§ 1522 and 1506 in the U.S. Bankruptcy Code), we do not share Jaffé's view that § 1506's public policy exception forecloses use of a balancing analysis under § 1522. Contrary to Jaffé's position,

---

alterations that Congress made was to change "adequately" in Article 22(1) to "sufficiently" in § 1522(a) -- a modification that the legislative history indicates was made in order "to avoid confusion with . . . 'adequate protection,'" "a very specialized legal term in United States bankruptcy." H.R. Rep. No. 109-31, pt. 1, at 115.

34

Chapter 15 does not require a U.S. bankruptcy court, in considering a foreign representative's request for discretionary relief under § 1521, to blind itself to the costs that awarding such relief would impose on others under the rule provided by the substantive law of the State where the foreign insolvency proceeding is pending. Instead, Chapter 15, like the Model Law, anticipates the provision of particularized protection, as stated in § 1522(a).

We therefore conclude, through interpretation of § 1522(a)'s text and consideration of Chapter 15's international origin, that the district court correctly interpreted § 1522(a)'s sufficient protection requirement as requiring a particularized balancing analysis that considers the "interests of the creditors and other interested entities, including the debtor," 11 U.S.C. § 1522(a), and, in this case in particular, a weighing of the interests of the foreign representative (the debtor) in receiving the requested relief against the competing interests of those who would be adversely affected by the grant of such relief (here, the Licensees). And we also agree that § 1506 is an additional, more general protection of U.S. interests that may be evaluated apart from the particularized analysis of § 1522(a).

In reaching this conclusion, we join the Fifth Circuit, which interpreted § 1522(a) similarly, based largely on the

35

language in the Guide to Enactment. See In re Vitro S.A.B. de C.V., 701 F.3d 1031, 1060, 1067 n.42 (5th Cir. 2012); see also In re Int'l Banking Corp. B.S.C., 439 B.R. 614, 626-27 (Bankr. S.D.N.Y. 2010); In re Tri-Cont'l Exch. Ltd., 349 B.R. 627, 637 (Bankr. E.D. Cal. 2006).

C

Finally, Jaffé contends that the bankruptcy court's balancing analysis, even if assumed appropriate, was flawed in implementation. He argues that the court dramatically overstated the risk to the Licensees' investments made in reliance on the cross-license agreements, especially in light of his offer to re-license Qimonda's U.S. patents to the Licensees at a RAND royalty rate. In this regard, he maintains that the court's balancing analysis failed to recognize that "§ 1522(a) requires courts to protect the interests of all 'creditors and other interested entities, including the debtor' -- not just one set of contracting parties."

The Licensees respond, arguing that "the bankruptcy court properly recognized that Dr. Jaffé's offer to relicense did not change the balance of harms" and that the bankruptcy court correctly "concluded that, without § 365(n) protection, the Licensees would face both the immediate harm of a hold-up and the future . . . destabilization of the licensing regime in the

semiconductor industry." They maintain that in light of the bankruptcy court's detailed findings and careful reasoning, Jaffé simply "cannot meet his heavy burden to demonstrate that the bankruptcy court abused its discretion in its application of § 1522."

It should be noted that after hearing four days of evidence, the bankruptcy court considered the outcome of its balancing analysis to be a close one. But in the end it concluded, reasonably we believe, "that the balancing of debtor and creditor interests required by § 1522(a), Bankruptcy Code, weigh[ed] in favor of making § 365(n) applicable to Dr. Jaffé's administration of Qimonda's U.S. patents." In re Qimonda AG, 462 B.R. at 182. The court recognized Jaffé's claim that the "application of § 365(n) [would] result in less value . . . being realized by the Qimonda estate." Id. But it noted that "Qimonda's patent portfolio [would] by no means be rendered worthless" because the "U.S. patents [could] still be licensed to parties that [did] not already have a license, and Dr. Jaffé, to the extent permitted by German law, [would] be able to fully monetize the non-U.S. patents." Id. Additionally, the bankruptcy court found it significant that "[a]pplication of § 365(n) . . . [would impose] no affirmative burden on Dr. Jaffé," id., but instead would merely limit his ability -- and, importantly, the ability of the patents' subsequent owners -- to

37

bring infringement actions against the very entities that Qimonda had previously promised not to sue. See Imation Corp. v. Koninklijke Philips Elecs. N.V., 586 F.3d 980, 987 (Fed. Cir. 2009) (characterizing a patent cross-license agreement as essentially "a promise by the licensor not to sue the licensee" for infringement (citation omitted)).

In considering and weighing the Licensees' interests, the bankruptcy court largely credited their evidence indicating that entrusting Jaffé with the right to administer Qimonda's U.S. patents without making § 365(n) applicable to the preexisting licenses under those patents would have broad-ranging ill effects. It explained that "the risk to the very substantial investment the [Licensees] -- particularly IBM, Micron, Intel, and Samsung -- [had] collectively made in research and manufacturing facilities in the United States in reliance on the design freedom provided by the cross-license agreements, though not easily quantifiable, [was] nevertheless very real." In re Qimonda AG, 462 B.R. at 182-83. While the bankruptcy court acknowledged that the Licensees had been unable "to identify specific Qimonda patents implicated by the products they manufacture[d] and s[old]," it noted that the lack of such evidence was "not at all surprising, since the whole point of portfolio cross-licenses [was] to eliminate the necessity (and in some cases impossibility) of individually analyzing each and

every patent that might possibly apply to determine if a new design infringe[d] on it." Id. at 181. Thus, although the bankruptcy court could not, in the course of its balancing analysis, make "a finding that cancellation of the [Licensees'] right to use Qimonda's U.S. patents would have a specific dollar impact on them," it did find that it "create[d] a substantial risk of harm," adding that "the threat of infringement litigation can be as damaging as an actual finding of infringement." Id.

We find the bankruptcy court's thorough examination of the parties' competing interests to have been both comprehensive and eminently reasonable.

Jaffé relies heavily on the mitigation that would result from his commitment to re-license Qimonda's patents to the Licensees on RAND terms, arguing that it would provide sufficient protection for their interests. Of course, his proposal -- first mentioned after the district court's remand -- does weigh in his favor by decreasing the Licensees' holdup risks. But just because the RAND proposal would reduce the Licensees' risks does not mean that their interests would be sufficiently protected by Jaffé's promise to re-license. The bankruptcy court expressly recognized this, explaining that "the hold-up risk is lessened by Dr. Jaffé's offer to re-license the patents on RAND terms," but emphasizing that "even if the WIPO

39

expert determination process were to arrive at the same figure that would have been agreed to in an 'ex ante' scenario, the [Licensees], because of their sunk costs, [would] not have the option of avoiding royalties altogether by designing around the patent."  In re Qimonda AG, 462 B.R. at 181-82.  We conclude that the bankruptcy court's findings in this regard are not unreasonable and that the bankruptcy court was justified in its skepticism of Jaffé's claim that the Licensees' interests would now be "sufficiently protected" by his commitment not to charge them an exorbitant rate during their re-licensing negotiations.

Moreover, the bankruptcy court also noted that it remained an "open question" whether any new license issued by Jaffé on RAND terms would itself be secure, expressing its concern that

> Dr. Jaffé could still sell the underlying patents to a purchaser -- whether a practicing entity or a 'troll' -- that might itself file for insolvency under German law or transfer the patent to a special purpose entity for the purpose of having it file for insolvency under German law.

Id. at 181-82 n.13.  The court's recognition of this concern was also reasonable, as it is far from clear whether, having once facilitated the termination of license rights in a foreign insolvency proceeding, the genie could ever be put back into the bottle.  Rather, as indicated by expert testimony that the bankruptcy court credited, it would seem all too likely that such a result would introduce a dangerous degree of uncertainty

40

to a licensing system that plays a critically important role in the semiconductor industry, as well as other high-tech sectors of the global economy.

At bottom, we affirm the decision of the bankruptcy court, finding reasonable its exercise of discretion in conducting the balancing analysis under § 1522(a) and concluding that attaching the protection of § 365(n) was necessary when granting Jaffé the power to administer Qimonda's U.S. patents. See In re Vitro S.A.B. de C.V., 701 F.3d at 1069 (noting in the course of affirming a bankruptcy court's decision not to enforce the reorganization plan adopted in a foreign main proceeding that "[i]t is not our role to determine whether the above-summarized evidence would lead us to the same conclusion" and adding that "[o]ur only task is to determine whether the bankruptcy court's decision was reasonable" (emphasis added)).

IV

It is important, we think, to recognize, as Jaffé would have us do, the importance of Chapter 15 to a global economy, in which businesses needing bankruptcy protection increasingly have assets in various countries. In mimicking the U.N.'s Model Law on Cross-Border Insolvencies, Chapter 15 furthers a policy of the United States of cooperating with other countries in providing fair and efficient insolvency proceedings for such

41

international businesses.  Consistent with its stated purposes, Chapter 15 provides for the ready recognition of foreign insolvency proceedings, see 11 U.S.C. § 1517, and grants automatic relief to protect U.S. assets upon entry of an order granting recognition, see id. § 1520.  It also provides for a broad range of discretionary relief under § 1521.  Thus, it represents a full commitment of the United States to cooperate with foreign insolvency proceedings, as called for by the U.N.'s Model Law on Cross-Border Insolvency.  And at bottom, such cooperation will provide greater legal certainty for trade and business to the benefit of the global economy.

But the United States' commitment is not untempered, as is manifested in both Chapter 15 and the Model Law on which it was based.  Thus, § 1522(a) requires that a bankruptcy court, when granting the discretionary relief authorized by § 1521, ensure sufficient protection of creditors, as well as the debtor.  And at a more general level, § 1506, which covers any action under Chapter 15, authorizes a bankruptcy court to refuse to take an action that would be manifestly contrary to U.S. public policy.

In this case, it is sufficient for us to affirm the bankruptcy court, based on its application of § 1522(a).  But in doing so, we understand that, by affirming the bankruptcy court's application of § 365(n) following its balancing analysis under § 1522(a), we also indirectly further the public policy

42

that underlies § 365(n).  The Senate Report accompanying the bill that became § 365(n) explicitly recognized that licensees have a strong interest in maintaining their right to use intellectual property following the licensor's bankruptcy and that to deny them that right would "impose[] a burden on American technological development that was never intended by Congress."  S. Rep. No. 100-505, at 1.  The Report added that "[t]he adoption of this bill will immediately remove that burden and its attendant threat to the development of American Technology."  Id. at 2.

In this case, the bankruptcy court, in weighing the respective interests of the Licensees and the debtor under § 1522(a), found that without the protection of 365(n), the risk of harm to the Licensees would be very real, impairing the "design freedom provided [them] by the cross-license agreements."  In re Qimonda AG, 462 B.R. at 183.  And as the bankruptcy court otherwise found, this potential harm to the Licensees would, in turn, threaten to "slow the pace of innovation" in the United States, to the detriment of the U.S. economy.  Id. at 185.  Thus, the court's findings, which were, to be sure, focused on the Licensees' interests, nonetheless necessarily furthered the public policy underlying § 365(n).

We thus recognize that by affirming the bankruptcy court, even though on its § 1522(a) analysis, we too necessarily

43

further the public policy inherent in and manifested by § 365(n).

The judgment of the bankruptcy court is accordingly

<u>AFFIRMED</u>.

WYNN, Circuit Judge, concurring in the judgment:

The only question we need to address in this appeal concerns the bankruptcy court's discretion in ensuring that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected" under Chapter 15 of the Bankruptcy Code, 11 U.S.C. § 1522, and whether the bankruptcy court abused that discretion here.  I agree with the majority opinion that in reviewing this issue, we look not to whether the record evidence "would lead us to the same conclusion" but that "[o]ur only task is to determine whether the bankruptcy court's decision was reasonable."  In re Vitro S.A.B. de C.V., 701 F.3d 1031, 1069 (5th Cir. 2012). Accordingly, I am happy to concur in the language in Parts I, II, and III of the majority opinion that analyzes and addresses only this issue.  I do not join in Part IV because it is unnecessary dictum.